# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNIVERSITY OF MARYLAND STUDENTS FOR JUSTICE IN PALESTINE, | * | |
| | * | |
| *Plaintiff*, | * | |
| v. | * | No. 8:24-cv-02683-PJM |
| | * | |
| BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF MARYLAND, *ET AL.*, | | |
| *Defendants*. | | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Jennifer A. DeRose
_____
JENNIFER A. DEROSE
Federal Bar No. 28374
PATRICK SHERIDAN
Federal Bar No. 27009
Assistant Attorneys General
Office of the Attorney General
200 St. Paul Place, 17th Floor
Baltimore, MD 21202

jderose@oag.state.md.us
(410) 576-6318
(410) 576-6437 (facsimile)

September 26, 2024                           Attorneys for Defendants

## TABLE OF CONTENTS

Page

**INTRODUCTION** .......................................................................................................... **4**

**STATEMENT OF FACTS** ............................................................................................ **5**

**LEGAL STANDARD** .................................................................................................. **13**

**ARGUMENT** ................................................................................................................ **14**

**I.   SJP Has Failed to Establish Its Likelihood of Success on the Merits.** **15**
   A.   The University's Decision to Withdraw Permission from Student Organizations for One Day Was Narrowly Tailored to Address the Compelling Governmental Interest of Protecting the Health and Safety of the University Community. ................ **15**

**II.  Plaintiff Will Not Suffer Irreparable Harm in the Absence of an Injunction.** **20**

**III. The Balance of the Equities Favors the University.** .............................. **21**

**IV.  Granting an Injunction is Against the Public Interest.** ........................ **23**

**CONCLUSION** ............................................................................................................ **23**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | * | |
| UNIVERSITY OF MARYLAND STUDENTS FOR JUSTICE IN PALESTINE, | * | |
| | * | |
| *Plaintiff*, | * | |
| | * | No. 8:24-cv-02683-PJM |
| v. | * | |
| BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF MARYLAND, *ET AL.*, | | |
| *Defendants*. | | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**MEMORANDUM IN OPPOSITION TO PLAINTIFF'S**
**MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY**
**INJUNCTION**

Defendants the Board of Regents of the University System of Maryland (the "BOR"), the University of Maryland College Park (the "University"), and Dr. Darryll Pines, President of the University, submit this Memorandum in Opposition to the Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction. For the reasons set forth below, the motion should be denied.

**INTRODUCTION**

The University maintains certain designated campus facilities and outdoor areas for the use of recognized student organizations and others to hold events, some of which are expressive in nature. For the past year, plaintiff, the University of Maryland Students for

Justice in Palestine ("SJP"), has registered to use these spaces more than 70 times, and the University has approved and facilitated every SJP event, despite heavy public criticism.

In late August, the University received credible threats of violence connected to a planned SJP event on October 7, 2024. Considering these threats in light of the totality of the circumstances on and off campus, and mindful of recent negative examples of similarly situated institutions that have been subjected to violence and disruption, the University implemented a narrowly-tailored restriction on the timing of student organization sponsored events. This restriction serves compelling University interests, including protecting public safety and the orderly functioning of the University's educational and scholarly activities. The restriction does not impermissibly restrict SJP's right to freedom of speech. SJP cannot satisfy any of the four factors of the test for preliminary relief, and its motion should be denied.

## STATEMENT OF FACTS

### The University Makes Its Physical Facilities and Outdoor Spaces Open to Expressive Activities Without Regard to Viewpoint.[1]

In keeping with its mission as the State's flagship higher education institution, the University seeks to promote a "supportive, respectful, and inclusive environment that

---

[1] Plaintiff alleges that USM "decided to cancel all expressive activities students had planned for October 7th on every one of its campuses." ECF 8 at 6. However, review of that allegation's supporting exhibit F reveals that USM's statement was in the form of a request or proposal. ECF 8 at Exh. F. Each president of a USM institution is that institution's chief executive officer, invested with the authority to manage and be accountable for the "discipline and successful conduct of the institution." Md. Code Ann., Educ. § 12-109 (d). Accordingly, it is not USM but the University, under the leadership of President Pines, that established the limitation on SJP's proposed event which is at issue in the present action. Likewise, any actions taken by other USM institutions under the

honors freedom of expression and complies with the First Amendment." Ex. A, Affidavit of Patricia A. Perillo ("Perillo Aff.") at Attachment 1, University of Maryland Policy and Procedures for the Use of Facilities and Outdoor Spaces at Section I. Policy. The University "supports the rights of individual students, faculty, staff, and student organizations to engage in the expression of ideas, demonstrate, and leaflet, provided such activities are lawful and consistent with University policies." Ex. A., Perillo Aff. at Att. 1, Appendix A, Guidelines for Expressive Activity. Accordingly, the University permits certain designated physical facilities and outdoor spaces to be used for expressive activities sponsored by members of the University community. Ex. A., Perillo Aff. at Att. 1, section IV A., C. Even in these designated spaces, the University applies rules designed to ensure the functioning of the campus and to promote the University's mission and goals, including educating students and protecting public safety. *See generally* Ex. A., Perillo Aff. at Att. 1.

In these designated or limited public forums, the University does not treat similarly situated groups differently and applies its rules on a viewpoint-neutral basis. Student organizations planning to host an event using campus facilities or outdoor spaces identify and reserve available space through an event management portal managed by the Stamp Student Organization Resource Center (the "SORC"). Ex. A., Perillo Aff. at ¶¶ 5 – 8. Once SORC staff are notified of a new reservation, a member of the Event and Guest Services ("EGS") team contacts the event planners to better understand the details of the planned

---

leadership of their respective presidents are not relevant to the present action. This opposition therefore concerns itself with the actions of the University, by and through its senior leadership.

event.  The event planners submit an event approval form containing additional information about the event. Ex. A., Perillo Aff. at ¶ 8.

The approval form is routed by EGS staff to University units for their feedback, including but not limited to the University of Maryland Police Department ("UMPD"), the Fire Marshal, Risk Management, groundskeeping, and the student organization's advisor for feedback on resources the event may require.  Ex. A., Perillo Aff. at ¶ 8.  EGS staff work with the event planners to make sure that appropriate resources are available.  Ex. A., Perillo Aff. at ¶ 8.  EGS staff receive training that stresses that the University provides space for expressive events on a content- and viewpoint-neutral basis.  Ex. A., Perillo Aff. at ¶ 8.  In policy and in practice, SORC and EGS staff do not evaluate proposed events based on what viewpoints may be expressed at the event.  Ex. A., Perillo Aff. at ¶ 8.

In addition to the review and facilitation of reservations by SORC staff, the UMPD convenes a University Event Management Team ("EMT") to review upcoming events. Exhibit B., Affidavit of David Mitchell ("Mitchell Aff.") ¶ 7, Ex. A., Perillo Aff. at ¶ 9. The EMT includes venue managers, major programming organizers (for example, Athletics, Recreation and Wellness), and operational divisions like the Department of Transportation Services and Facilities Management.  Ex. B., Mitchell Aff. at ¶ 7, Ex. A., Perillo Aff. at ¶ 9.  The group meets regularly to review upcoming events and identify any potential challenges or need for additional resources. Ex. B., Mitchell Aff. at ¶ 7, Ex. A., Perillo Aff. at ¶ 9.  As with the SORC review, the EMT does not evaluate or consider the viewpoints likely to be expressed at upcoming events.  Ex. B., Mitchell Aff. at ¶ 7, Ex. A., Perillo Aff. at ¶ 9.

Pursuant to University policy, the University reserves the right to reschedule a program "to prevent substantial disruption of the advancement of the University's teaching, research, and service mission, prevent substantial disruption of normal or scheduled users of University property; facilitate traffic on University property; preserve residential tranquility for students; preserve an atmosphere conducive to learning; preserve University property; and protect the health, safety, and welfare of the University community and individuals using University property." Ex. B., Mitchell Aff. at Attachment 2, Policy at VII. A. The University, therefore, dedicates significant time and resources to facilitating all manner of student expressive events while maintaining its ability to protect the safety of the University community and prevent substantial disruption to the University's educational mission.

### The University Has Consistently Facilitated Events Sponsored by SJP Despite Unprecedented Levels of Public Complaint Urging the University to Restrict SJP's Speech.

In keeping with these University policies and practices, the University has consistently facilitated events hosted by groups espousing any and all viewpoints, including those hosted by SJP. The UMPD and Student Affairs staff have fostered strong working relationships with student organizations engaged in expressive conduct. Ex. B., Mitchell Aff. at ¶ 10, Ex. A., Perillo Aff. at ¶ 12. As a result of this work, the University has not suffered the violence, conflict, or widespread disruptions to campus life that other colleges and universities have experienced in the past year. Ex. B., Mitchell Aff. at ¶ 10, Ex. A., Perillo Aff. at ¶ 12. Instead, the University has ensured the safety and security of the community while facilitating peaceful protests and demonstrations and protecting the

free speech rights and safety of all community members, including SJP.  Ex. B., Mitchell Aff. at ¶ 10, Ex. A., Perillo Aff. at ¶ 12.

Since October 7, 2023, the SJP has held more than 70 events on campus, including meetings, protests, sit-ins, and demonstrations, all without significant disruption or conflict despite the heightened emotions and tensions on campus during this time.  Ex. B., Mitchell Aff. at ¶ 10, Ex. A., Perillo Aff. at ¶ 12.  During the same period, the University received a constant stream of communications via phone and email that have been strongly critical of the University for allowing University students and student organizations to express political opinions like those espoused by SJP.  Ex. A. Perillo Aff. at ¶ 14.  Some of these communications have even demanded that the University shut down SJP, despite the lack of any legitimate basis for doing so.  Ex. A. Perillo Aff. at ¶ 14.  Notwithstanding this constant criticism, the University has steadfastly adhered to its policy and practice of permitting expressive events, including those hosted by SJP, without regard to the organization's viewpoint.  Ex. A. Perillo Aff. at ¶ 14.  In short, despite unprecedented and often heated public complaint and criticism, the University granted and facilitated every request for campus space by SJP until September 1, 2024, when the University concluded that it needed to cancel all University student organization sponsored expressive events on October 7, 2024 due to serious and concrete safety concerns.

**At the End of August 2024, University Leadership Determined that the University Could Not Reasonably Assure the Safety of In-Person Student Organization Sponsored Expressive Campus Events Held on October 7, 2024.**

The University has faced significant security challenges since the beginning of the armed conflict in Israel and Gaza on October 7, 2023.  Ex. B. Mitchell Aff. at ¶ 8.  The ongoing conflict has heightened emotions and tensions on campus and led to numerous protests and demonstrations.  Ex. B. Mitchell Aff. at ¶ 8.  While the University has safely navigated these challenges so far, the safety and security challenges posed by expressive events proposed by University student groups for October 7, 2024 are of a different nature and degree than for any other event held over the past year.  Ex. B., Mitchell Aff. at ¶ 14, Ex. A., Perillo Aff. at ¶ 15.  For example, an email sent to President Pines' public email address expressed hope that President Pines' children and grandchildren would one day be slaughtered.  Ex. B., Mitchell Aff. at ¶ 13.  Another individual wrote to President Pines, who is Black, that "my Klan Rally with sheets and a noose was also approved," and that "[w]e will be hanging several look alike [*sic*] to key university staff."  Ex. B., Mitchell Aff. at ¶ 13.  On August 30, the University's Deputy General Counsel received a call from an individual who stated that she was "locked and loaded" and intended to bring a gun to campus for self-defense.  Ex. B. Mitchell Aff. at ¶ 13.

It was in the context of these unprecedented threats that President Pines convened a meeting of University leadership, including UMPD Chief David Mitchell and Vice President for Student Affairs Patricia A. Perillo, Ph.D.  Ex. B., Mitchell Aff. at ¶ 18, Ex. A., Perillo Aff. at ¶ 18.  President Pines asked Chief Mitchell to assess the safety and security risks posed by the University hosting student-sponsored events on October 7,

2024.  Ex. B., Mitchell Aff. at ¶ 18.  Chief Mitchell explained that, in his view, allowing expressive events to go forward on October 7 would present a material and significant risk of danger to the campus community, unlike anything the University had seen over the past 11 months.  Ex. B., Mitchell Aff. at ¶ 18.  Chief Mitchell recommended to President Pines that all expressive University student organization events proposed for October 7 be rescheduled to other dates, in coordination with the leaders of these student organizations. Ex. B., Mitchell Aff. at ¶ 18.

The distressing and violent threats were not the only factors in UMPD Chief David Mitchell's safety and security analysis.  Chief Mitchell was able to draw upon his experience of 53 years in law enforcement and over 14 years as Chief of UMPD.  Ex. B., Mitchell Aff. at ¶¶ 2, 4.  He considered input from UMPD's Information Analysis Unit, which is dedicated to monitoring open source information communicated through message boards, news sites, and social media postings to assess broader security issues and potential threats to the University community.  Ex. B., Mitchell Aff. at ¶ 15.  He also considered the violence and widespread disruptions occurring at other, similarly situated colleges and universities over the past year, such as those at Columbia University, New York University, and the University of California Los Angeles.  Ex. B., Mitchell Aff. at ¶ 16.  These incidents, in his view, reflect recent comparable circumstances leading to violence and disruption on campuses and serve as a reliable indication of what could likely occur if student organization expressive events were to go forward on October 7, 2024.[2]  Ex. B.,

---

[2] The Court may take judicial notice of the violence and disruption that swept numerous university campuses in the past year.  *See, e.g.* Alan Blinder, *What We Know*

Mitchell Aff. at ¶ 16.  Dr. Pines heeded Chief Mitchell's advice and, consistent with University policy, decided that no student expressive event would be permitted on that day, and rescinded permission for student organizations to hold expressive events on that date. ECF 8 at Ex. E.  The events that had previously received permission, which was then rescinded, were the SJP event as well as three events organized by the Jewish Student Union ("JSU").

Thereafter, in coordination with Student Affairs, SJP reserved space on campus for expressive events on October 8, 2024.  Ex. A., Perillo Aff. at ¶ 20.  The JSU has reserved space on campus for expressive events on October 6, 2024.  Ex. A., Perillo Aff. at ¶ 20.

### Dr. Pines' September 1, 2024 Communication to the Campus Community Was Intended to Announce the Protective Measure While Not Inciting Panic or Undue Distress.

As Dr. Pines developed his September 1, 2024 communication to the campus community, he consulted members of his leadership team, including Dr. Patricia Perillo,

---

*About the Protests and Arrests at Columbia University*, N.Y. TIMES, (Apr 22, 2024), https://www.nytimes.com/2024/04/22/us/columbia-university-protests.html (hundreds of Columbia University students arrested by police in riot gear in repeated sweeps over a span of several weeks); Kiara Alfonseca, *A Look at the Violent Clashes at UCLA as College Protests, Counterprotests Intensify*, ABC NEWS (May 1, 2024), https://abcnews.go.com/US/violent-clashes-ucla-college-protests-counterprotests-intensify/story?id=109828027 (large, violent clashes between protesters and counter-protesters at UCLA); Christina Fan, Jennifer Bisram, CBS NEWS, *120 Arrested at NYU Protests* (April 24, 2024), https://www.cbsnews.com/newyork/news/nyu-pro-palestinian-protest-campus-security/ (over 120 arrested at protests at NYU).  Since September 1, 2024, tensions are running even higher with the expansion of the conflict into Lebanon.  *See* Nadine El-Bawab, *Israel Prepares for Potential Ground Invasion of Lebanon, Continues Airstrikes on Hezbollah*, ABC NEWS (September 25, 2024), https://abcnews.go.com/International/israel-prepares-potential-ground-invasion-lebanon-continues-airstrikes/story?id=114076028.

Vice President for Student Affairs.  Ex. A., Perillo Aff. at ¶ 22.  Dr. Perillo leads the Division of Student Affairs, which works to ensure the success, health, and well-being of students through its 16 departments.  Ex. A., Perillo Aff. at ¶ 2.  In that role, she was acutely aware that some community members have felt generally less safe during the past year of political turmoil.  Ex. A., Perillo Aff. at ¶ 22.  Thus, she supported the inclusion of the phrase, "there is no immediate or active threat" in President Pines' message to reassure the University community that there was no immediate, active threat of violence to the community anticipated to occur on September 1, 2024 or in the days immediately thereafter.  Ex. A., Perillo Aff. at ¶ 22.  University leadership believed, however, that there was a credible threat of violence on October 7, 2024, over a month in the future.  Ex. A., Perillo Aff. at ¶ 22.  In their view, that threat was effectively and narrowly addressed by the decision to deny University student organizations permission to sponsor expressive events on that date, while permitting them to go forward on other dates.  Ex. A., Perillo Aff. at ¶ 22.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 65(a), a court may issue a preliminary injunction upon the requisite showing at a hearing.  A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008).  It is "granted only sparingly and in limited circumstances." *St. Michael's Media, Inc. v. Mayor and City Council of Baltimore*, 566 F. Supp.3d 327, 351 (D. Md. 2021) (internal quotations omitted).  A plaintiff must make a clear showing of

entitlement to such relief. *Dewhurst v. Century Aluminum Co*., 649 F.3d 287, 290 (4th Cir. 2011).

To obtain preliminary injunctive relief, the moving party must establish four factors: (1) that [it] is "likely to succeed on the merits;" (2) that [it] is "likely to suffer irreparable harm" absent injunctive relief; (3) "that the balance of equities tips in [its] favor;" and (4) that injunctive relief is in the "public interest." *Winter*, 555 U.S. at 20; *see also WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009). Injunctive relief "should be no more burdensome to the defendant than necessary," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753 (1994), and a court should "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24. A preliminary injunction "cannot issue absent a 'clear showing' that all four requirements are satisfied." *St. Michael's Media*, 566 F. Supp.3d at 351 (quoting *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 979 F.3d 219, 226 (4th Cir. 2020)).

The standards for granting a motion for a temporary restraining order and a preliminary injunction are the same. *Virginia v. Kelly*, 29 F.3d 145, 147 (4th Cir. 1994).

## ARGUMENT

SJP has failed to establish all four elements that are required to warrant the extraordinary measure of injunctive relief. It has not established the likelihood of success on the merits, that it will suffer irreparable harm without an injunction, that the balance of equities tips in its favor, or that public interest favors injunctive relief. *See Winter*, 555 U.S. at 20; *see also Doe v. Wake Forest Univ.*, No. 1:23-CV-00114, 2023 WL 2239475, at

*1–2 (M.D.N.C. Feb. 27, 2023) (citing *Winter*, 555 U.S. at 20, 24) (holding that all four *Winter* factors must be established to warrant injunctive relief).  As such, SJP's motion should be denied.

## I.   SJP HAS FAILED TO ESTABLISH ITS LIKELIHOOD OF SUCCESS ON THE MERITS.

The University has consistently withstood public pressure to infringe upon SJP's First Amendment rights.  At the end of August 2024, it recognized a new, substantially different degree of safety risk associated with student expressive events scheduled for October 7.  The University's highest-ranking safety and security officer advised the President that, in his expert professional judgment, the safety of the University community would be at risk of violent conduct by individuals outside the University community if student organization sponsored expressive events went forward on October 7, 2024.  The decision to work with student organizations to reschedule their expressive events was not a violation of their First Amendment rights because the time restriction was narrowly tailored to address a compelling governmental interest.  Accordingly, SJP cannot establish a likelihood of success on the merits.

### A. The University's Decision to Withdraw Permission from Student Organizations for One Day Was Narrowly Tailored to Address the Compelling Governmental Interest of Protecting the Health and Safety of the University Community.

In First Amendment cases, there are three types of forums:  traditional public forums, non-public forums, and limited public forums.  *ACLU v. Mote*, 423 F.3d 438, 443 (4th Cir. 2005).  A limited public forum "is one that is not traditionally public, but the government has purposefully opened to the public, or some segment of the public, for

expressive activity." *Id.* at 443.  The University's campus is a limited public forum.  *Id.* at 444.  Accordingly, because SJP is "within the class to which [the University campus] is made generally available," restrictions on SJP's speech are subject to strict scrutiny.  *Id.* Under a strict scrutiny analysis, the challenged restrictions must be "necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end."  *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983).

Here, the compelling state interests are dictated by the higher education setting of the proposed speech.  The Supreme Court has "recognized that First Amendment rights must be analyzed in 'light of the special characteristics of the school environment.'" *Widmar v. Vincent*, 454 U.S. 263, 268 n.5 (1981) (quoting *Tinker v. Des Moines Indep. Sch. Dist.*, 393 U.S. 503, 506 (1969)).  "A university differs in significant respects from public forums such as streets or parks or even municipal theaters.  A university's mission is education, and decisions of this Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities."  *Id.*

The University has developed detailed policies and administrative systems to provide student organizations access to suitable, designated areas of campus for their expressive activities.  *See* Ex. A., Parillo Aff. at ¶¶ 5 – 9.  This access is not unbounded: the University has established additional guidance and policies that govern student events. *See* ECF 23, Defendants' Response to Inquiry Requesting Certain Documents.  Among these policies, the University reserves the right to reschedule a program "to prevent substantial disruption of the advancement of the University's teaching, research, and

service mission, prevent substantial disruption of normal or scheduled users of University property; facilitate traffic on University property; preserve residential tranquility for students; preserve an atmosphere conducive to learning; preserve University property; and protect the health, safety, and welfare of the University community and individuals using University property." Ex. B., Mitchell Aff. at Attachment 2, Policy at VII. A.

The present facts stand in acute contrast to those in *St. Michael's Media, Inc., v. Mayor and City Council of Baltimore*, 566 F. Supp.3d 327 (D. Md. 2021). In that case, the City of Baltimore banned a prayer rally and conference at a City-owned concert venue, the Pier VI concert pavilion. Both *St. Michael's Media* and the present case concern access to a limited public forum, but that is where the similarity ends. The *St. Michael's Media* court concluded that in denying the plaintiff the opportunity to conduct the prayer rally and conference, the City engaged in impermissible viewpoint-based restriction of speech when it exercised unfettered discretion on an ad hoc basis, invoking or relying upon the 'heckler's veto.' *Id*. at 370.

By contrast, the University's conduct was not unfettered, but guided on the one hand by its policy on security at outdoor events, and on the other by the expert analysis and assessment of Chief Mitchell regarding threats to campus safety. Far from conceding to a heckler's veto, the University consistently defended SJP's First Amendment rights in the face of unprecedented criticism, and only moved to impose a limited time restriction on <u>all</u> student-sponsored expressive campus events – regardless of viewpoint expressed – when the University's Police Chief, a career law enforcement officer with long experience in

campus safety at the University, concluded that student sponsored expressive events on this one day would create a unique risk to the safety of the University community.

In the present case, and unlike the City of Baltimore in *St. Michael's Media*, the University's safety concerns did not arise from the behavior, rhetoric, or viewpoint of the speaker. To the contrary, the University did not anticipate that SJP would engage in violent or disruptive conduct on October 7. *See* Ex. B., Mitchell Aff. at ¶ 18. Rather, Chief Mitchell's assessment was based on, among other things, his review of explicit communications from individuals expressing violent intentions surrounding the proposed October 7, 2024 event. Ex. B., Mitchell Aff. at ¶¶ 11 – 18. He considered these communications in light of his department's open-source information gathering and the recent experience of other higher education institutions in similar circumstances, such as at Columbia University, New York University, and the University of California Los Angeles, which experienced violent clashes, large scale arrests, and disruption of educational activities. Ex. B., Mitchell Aff. at ¶¶ 11 – 18.

In *St. Michael's Media*, the City identified the viewpoint of the proposed speakers, as demonstrated by their past inflammatory statements, as a basis for the City's concerns about safety. *St. Michael's Media*, 566 F. Supp.3d at 368. Here, the University has consistently facilitated SJP's speech and did not consider that organization, nor its viewpoint, to be a source of risk. Ex. B., Mitchell Aff. at ¶¶ 10, 15. The University's goal has not been to silence SJP, but to protect its members and all community members from a credible risk of violence.

Indeed, campus leadership was so concerned about the possibility of violence on October 7, 2024 that they discussed whether it would be necessary to cancel all in-person classes and activities and move classes online for the day.  Ex. A., Perillo Aff. at ¶ 19. Ultimately, the University concluded that the narrowest restriction that could be imposed to ensure the safety of the campus community was to temporarily halt student organization sponsored expressive activities on campus for that one day, and to offer the affected student organizations the opportunity to reschedule events for different dates.  Ex. B., Mitchell Aff. at ¶ 18, Ex. A., Perillo Aff. at ¶ 18.  Again, this is in stark contrast to *St. Michael's Media*, in which the City of Baltimore completely banned a group from holding any event at a City-owned concert venue.  *See St. Michaels Media* at 334.   In short, the University, governed by policy and expertise, imposed a limitation on the time of expressive activity that is as narrowly drawn as possible to achieve its compelling interest of maintaining campus safety.

The University has an additional compelling interest that was not present in the *St. Michael's Media* case: an interest in continued University operations without substantial disruption.  "As long as school officials reasonably forecast a substantial disruption, they may act to prevent that disruption without violating a student's constitutional rights, and we will not second guess their reasonable decisions." *Hardwick v. Heyward*, 711 F.3d 426, 440 (4th Cir. 2013).  Where the purpose of Pier VI is to serve as a venue periodically hosting musical, comedy, and other entertainment events, the University is charged with maintaining continuous operation in support of an educational and scholarly community of

over 60,000 members, *see* Ex. B., Mitchell Aff. at ¶ 4, for the benefit of that community and the State as a whole.  As a consequence,

> [u]niversity officials are charged with the responsibility of conducting a well-ordered institution, and in carrying out their responsibility they have not only the right but the duty to adopt and enforce such policies and regulations as may seem to them in their fair, reasoned best judgment to be required by the factual situation with which they are faced.

*Evans v. State Bd. of Agric.*, 325 F. Supp. 1353, 1360 (D. Colo. 1971).  Here, the University leadership adopted a narrowly tailored restriction only after receiving Chief Mitchell's analysis and recommendation, to serve the compelling governmental interest in avoiding a violent disruption to the functioning of the University.  In sum, the University's actions survive strict scrutiny and SJP will be unable to succeed on the merits.

## II.   PLAINTIFF WILL NOT SUFFER IRREPARABLE HARM IN THE ABSENCE OF AN INJUNCTION.

In addition, SJP cannot establish that it will suffer irreparable harm if the injunction is denied.  "The failure to show irreparable harm is, by itself, a sufficient ground upon which to deny a preliminary injunction." *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).  SJP argues that it will suffer irreparable harm without an injunction because irreparable harm is presumed if the constitutional injury is proven.  *See* ECF 8 at 6-7; *Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003).

For the reasons set forth in Section I. above, SJP has not shown a constitutional injury because it has not shown it is likely to succeed on the merits.  SJP has additionally failed to articulate any other harm it would suffer as a result of the University's decision, absent a constitutional injury.  In fact, the organization's ability to stage the same event,

engaging in the same speech and expression, on the day after it was originally proposed demonstrates that SJP will suffer no practical harm from the event's delay.  Accordingly, because SJP cannot demonstrate a constitutional infringement, it has not demonstrated that it will suffer "irreparable harm" if the injunction is denied.

## III.    THE BALANCE OF THE EQUITIES FAVORS THE UNIVERSITY.

Even if SJP could establish the likelihood of success on the merits, the injunction should still be denied because the balance of equities weighs against an injunction.  The University has significant and compelling interests here, which weigh heavily against granting an injunction.

Consideration of SJP's right to free expression is "shaped by the educational context in which it arises," *Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 685 (2010).  Thus, the Court must be mindful of the compelling interests that are applicable to this context.  First Amendment claims must "be analyzed in light of the special characteristics of the school environment."  *Id.* at 686-87.  First and foremost, "[a] university's mission is education, and decisions of this Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities."  *Widmar v. Vincent*, 454 U.S. 263, 268 n.5 (1981).

More broadly, and "in furtherance of the University's educational mission," the University also has a significant interest in "protecting the educational experience of the students…."  *Bowman v. White*, 444 F.3d 967, 980 (8th Cir. 2006) (holding that "[t]his interest is significant because an educated electorate is essential to the vitality of our

democracy and a lack of proper education diminishes the value of our free speech rights"). Similarly, the University has a compelling interest in "ensuring public safety" of its campus community, which, "[l]ike education, is a fundamental human need without which the desire to speak one's mind becomes moot." *Id*. Plainly, the educational mission of the University and the educational experience of its students would be deeply harmed by an outbreak of the type of violence and disruption that has ravaged university campuses in the past year.

To the extent Plaintiff argues that its competing interest is in not having its First Amendment rights infringed upon, this argument fails to tip the balance in its favor because, as demonstrated above, it is not likely to succeed on such a claim. "When a party seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor." *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014). This is because the "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). However, because SJP has not had its First Amendment freedoms impermissibly infringed, the balance tips strongly against granting an injunction.

Accordingly, SJP has failed to demonstrate that its interest in conducting its event on October 7, 2024, rather than October 8, 2024, outweighs the University's strong and compelling interests in protecting the public's safety and maintaining the orderly functioning of the University's educational and scholarly activities. Therefore, SJP's request for an injunction should be denied.

IV.    GRANTING AN INJUNCTION IS AGAINST THE PUBLIC INTEREST.

In addition to SJP's failure to demonstrate all the other elements warranting issuance of an injunction, it has also failed to demonstrate that an injunction is in the public interest. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24. There is a strong public interest against an injunction in this case. Specifically, because the University is a public institution, the University's compelling interests set forth above are also compelling interests for the public at large. The "State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective." *Heffron v Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 650 (1981) (citing cases). Although the public has an interest in ensuring that students' First Amendment rights are protected, as demonstrated above there has been no deprivation of plaintiff's First Amendment rights. As such, the public interest weighs against granting an injunction.

## CONCLUSION

For all the reasons set forth above, the motion for a preliminary injunction should be denied.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Jennifer A. DeRose

_____

JENNIFER A. DEROSE
Federal Bar No. 28374

PATRICK SHERIDAN
Federal Bar No. 27009
Assistant Attorneys General
Office of the Attorney General
200 St. Paul Place, 17th Floor
Baltimore, Maryland 21202
jderose@oag.state.md.us
(410) 576-6318
(410) 576-6437 (facsimile)

September 26, 2024                     Attorneys for Defendants

**CERTIFICATE OF SERVICE**

I certify that, on this 26th day of September, 2024 the foregoing memorandum in opposition to plaintiff's motion for a temporary restraining order and preliminary injunction was served by CM/ECF on all registered CMF users:

>Lena F. Masri, Esq.
>453 New Jersey Avenue SE
>Washington, District of Columbia  20003
>lmasri@cair.com
>
>Gadeir I. Abbas, Esq.
>453 New Jersey Avenue SE
>Washington, District of Columbia  20003
>gabbas@cair.com

>/s/ Jennifer A. DeRose
>_____
>Jennifer A. DeRose