UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAYLAND
SOUTHERN DIVISION

| | |
|---|---|
| **University of Maryland Students for Justice in Palestine,**<br><br>          Plaintiff,<br><br>     v.<br><br>**Board of Regents et al.,**<br><br>          Defendants. | Case No. 24-cv-02683<br><br>[PROPOSED] BRIEF OF *AMICI CURIAE* AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF MARYLAND, FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION, AND KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION |

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................................ i

INTRODUCTION & SUMMARY OF ARGUMENT ................................................................... 1

FACTUAL BACKGROUND ......................................................................................................... 3

ARGUMENT .................................................................................................................................. 3

      I.      The University's revocation of UMD SJP's event authorization and the October 7 ban on all expressive student events are unconstitutional content-based restrictions on speech. .................................................................................................................... 3

      II.     Alternatively, the University's restriction on student-led "expressive events" fails reasonableness review. ............................................................................................... 8

CONCLUSION ............................................................................................................................. 11

**INTRODUCTION & SUMMARY OF ARGUMENT**

In a transparent attempt to suppress student expression about Israel and Palestine, the University of Maryland ("University") has banned all student-led "expressive events" throughout its campuses on the anniversary of the October 7 attacks in Israel. This is a content-based restriction on student speech, and it triggers and fails strict scrutiny. But even if strict scrutiny did not apply, the University's categorical ban on students' expressive events would fail First Amendment review because it is not reasonably related to the campuses' purposes as places for education and free exchange between members of the University community, and because it is incapable of reasoned application. Students' right to free expression in America's public universities cannot be curtailed on days of symbolic importance just because the university deems the message intolerable.

As the Supreme Court has explained, "the campus of a public university, at least for its students, possesses many of the characteristics of a public forum." *Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981). And the Fourth Circuit has held that the University of Maryland's campuses are limited/designated public forums for students and other members of the campus community, where "the members of the University community . . . are permitted to speak freely." *ACLU v. Mote*, 423 F.3d 438, 444 (4th Cir. 2005). Because Plaintiff University of Maryland Students for Justice in Palestine ("UMD SJP" or "SJP") is a university student organization, any content-based restriction on its speech is subject to strict scrutiny. *Id.*

The restrictions at issue here are two-fold. First, the University revoked, without justification, the permission it had previously granted to UMD SJP to host what SJP described as a vigil commemorating the thousands of Palestinians killed in Gaza since October 7, 2023, as well as teach-ins on Palestinian history and culture and interfaith prayer. Second, dressing its censorship in the guise of formal evenhandedness, the University banned *all* "expressive events" that are not "university-sponsored" on the University of Maryland system's campuses on October 7 this year.

1

These restrictions are content-based, and they fail strict scrutiny. As the University itself acknowledges, its revocation of the permission it previously granted to UMD SJP was a capitulation to individuals who are hostile to the content of SJP's proposed event—a quintessential example of an unlawful, content-based heckler's veto. Compl. ¶ 3. And the ban on all expressive events by students on October 7 is just as content-based as a ban on student speech on the anniversary of Tiananmen Square or 9/11 would be. The University cannot show that this broad stroke of censorship furthers, much less is narrowly tailored to, a compelling interest given the absence of any concrete evidence of a security threat.

Even if strict scrutiny did not apply, the University's categorical ban on "expressive events" on October 7 would still violate the First Amendment because it is manifestly unreasonable. On the one hand, if the University seriously intends to suppress *any* expressive student event on October 7, then its proposed restriction is not reasonably related to the University's function as a place of learning and discussion; on the other, if the University intends only to suppress student expression that runs afoul of some undisclosed criteria, then its restriction is not capable of reasoned application. Either way, the ban on students' expressive events cannot stand.

For these reasons, the Court should recognize the distinct First Amendment violations raised by the University's actions and grant Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction.

## FACTUAL BACKGROUND

On July 31, 2024, Plaintiff UMD SJP sought and received the University's permission to host an event on October 7, 2024, on McKeldin Mall, a nine-acre square on the College Park campus traditionally open to student expression. Compl. ¶¶ 21–24, 27. As UMD SJP told the University when applying for permission, it planned to "commemorat[e] the thousands of lives lost" in Gaza during the past year, and to host "teach-ins about Palestinian history, culture and solidarity between Palestinians and other marginalized groups; tables highlighting Palestinian art and traditional crafts; a visual display of kites, a motif in Palestinian poetry; as well as a vigil and inter-faith prayers." *Id*. ¶ 25. Another student organization, Jewish Voice for Peace at the University of Maryland, planned to co-sponsor the event, and "had planned to build a community space to grieve all innocent lives that have been lost in the past year, Palestinian and Israeli, while acknowledging the unique magnitude of Palestinian suffering as the death toll in Gaza climbs." *Id.* ¶ 27.

In the coming weeks, individuals and groups both within and outside the University of Maryland community pressured the University to cancel Plaintiff's event because they objected to the anticipated political messages and viewpoints that SJP might convey. *Id.* ¶¶ 31–35, 39. Despite determining that there were no safety or security threats associated with the October 7 event, University of Maryland President Darryll Pines acquiesced to this pressure. He revoked permission for Plaintiff to host its event and announced a total ban on any "expressive" student event on October 7 across all University of Maryland campuses. *Id*. ¶¶ 40–52.

## ARGUMENT

I.  **The University's revocation of UMD SJP's event authorization and the October 7 ban on all expressive student events are unconstitutional content-based restrictions on speech.**

The Fourth Circuit has held that the University's campuses are "limited" or "designated" public forums for student groups like Plaintiff and other members of the university community.

3

As such, strict scrutiny applies to content-based restrictions on student speech. And the University cannot meet that high bar in defending its October 7 expressive speech ban.

In *Mote*, the Fourth Circuit held that the University of Maryland College Park campus qualified as a "limited" or "designated" public forum for campus members. 423 F.3d at 444. In contrast to traditional public forums (which have historically been held open for expression by all members of the public) and nonpublic forums (where the forum has not been opened to expressive activity at all), the court characterized a limited or designated public forum as "one that is not traditionally public, but the government has purposefully opened to the public, or some segment of the public, for expressive activity." *Id.* at 443. Where such a forum has been opened only to a segment of the public, strict scrutiny applies when the government tries to exclude a topic or speaker that falls within the class to which the forum has been made generally available (the "internal standard"); however, where the government tries to exclude a speaker to whom the forum has not been made generally available, it need only show that its restriction is reasonable and viewpoint neutral (the "external standard"). *Id.* at 444.

Reasoning that "the purpose of the University is clearly to provide a venue for its students to obtain an education, not to provide a venue for expression of public views that are not requested or sponsored by any member of the campus community," the Fourth Circuit held in *Mote* that content-based restrictions on speakers from *outside* the university did not trigger strict scrutiny. *Id.* But the court acknowledged that a different rule would apply to restrictions on speech by "members of the University community who are permitted to speak freely on University grounds." *Id.*

That is precisely the case here. First, the University's restrictions squelch the speech of the very community the campuses' limited public forum is meant to serve, because SJP is a registered student organization and seeks to host an event only featuring speakers among its own

4

membership. Compl. ¶ 42; *see Mote*, 423 F.3d at 444.

Second, the restrictions are content-based because they "target speech based on its communicative content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).[1] The University candidly explained that it was banning "expressive" events on October 7 because of the date's "significance," and the "horrific suffering it represents for people here on our campus and across the globe." Compl. Ex. C (University President Pines' Sept. 1, 2024 letter to the campus community ("Pines Letter")). It specifically banned events on October 7 only, and allowed UMD SJP and University Maryland Jewish Voices for Peace to proceed with their planned joint event on October 8 instead. Compl. ¶ 44. The University's objections to Plaintiffs' expression on October 7 boil down to its concern that a message acceptable on any other day is too controversial on that particular day, specifically because of what it says. That is a classic content-based restriction.

Furthermore, it is clear that the University's ban will in practice require enforcement based on the content of student speech. Although the University purports to ban *all* unsponsored expressive events on October 7, that cannot be true. The University cannot seriously purport to ban every single expressive event that might take place throughout the University of Maryland system on that day: every concert, dance, play, poetry reading, art exhibition, debate, fundraiser, club meeting, protest, etc. taking place across its campuses—even for a single day. Such a ban would be impossible to enforce and would amount practically to a total shutdown of the university's core functions. Plainly, the University means to restrict expressive events about Israel

---

[1] Even where a government measure is "facially content neutral," it will still trigger strict scrutiny if it "cannot be 'justified without reference to the content of the regulated speech.'" *Reed*, 576 U.S. at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)); *see also City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 76 (2022) ("If there is evidence that an impermissible purpose or justification underpins a facially content-neutral restriction, for instance, that restriction may be content based.").

5

and Palestine on October 7, and will enforce its ban on "expressive events" with that priority, on those contents, in mind.

Moreover, the University based the October 7 ban on concerns about how others would respond to SJP's message on that day, enacting a textbook heckler's veto and further confirming its content-based purpose. "Speech cannot be . . . punished or banned, simply because it might offend a hostile mob." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134–35 (1992). "[A] speech burden based on audience reactions is simply government hostility and intervention in a different guise. The speech is targeted, after all, based on the government's disapproval of the speaker's choice of message." *Matal v. Tam*, 582 U.S. 218, 250 (2017) (Kennedy, J., concurring). As the Fourth Circuit has explained, censorship based on a heckler's veto is "an impermissible form of content-based speech regulation" that is subject to strict scrutiny. *Rock for Life–UMBC v. Hrabowski*, 411 F. App'x 541, 553–54 (4th Cir. 2010).

Finally, the University's decision to ban all student-led "expressive" events on October 7, even as it touts "university-sponsored events that promote reflection," Pines Letter, Compl. Ex. C, evinces its desire to monopolize the campus discussion and promote its preferred messages on a day of particular significance to many members of the campus community, even if what it signifies is greatly contested within that community. The University is of course free to broadcast its views to the campus community; however, it cannot silence students' voices to make its own message easier to hear.

This content-based ban fails strict scrutiny. To survive strict scrutiny, the government must show that the restriction is necessary to achieve a compelling government interest and the least restrictive means for doing so. *Reed*, 576 U.S. at 163. The University's restriction cannot meet this high bar.

First, while the university's interest in maintaining a secure, orderly forum for students to

engage in the educational process is compelling, *see Healy v. James*, 408 U.S. 169, 180 (1972), by the University's own admission, there is "no immediate or active threat" underlying the University's October 7th ban on expressive events. Compl. ¶ 50. Merely invoking a vague interest in safety, or offering at most "ambiguous proof" of such an interest, cannot suffice to establish the kind of government interest necessary to satisfy strict scrutiny. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 800 (2011). To the contrary, imposing an all-day ban on expressive events runs counter to the public university's core purpose of facilitating the education of its students, *see Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819, 824 (1995), and in fact impairs its interests in offering "the college classroom with its surrounding environs" as "peculiarly the marketplace of ideas," *Healy*, 408 U.S. at 181.

Second, the blanket ban on student expression is not narrowly tailored, even to address a conjectural security concern. A court need not "denigrate the necessity to protect persons and property or to maintain proper order and decorum" on campus in order to "question whether a total ban" on expression sufficiently serves these purposes. *See United States v. Grace*, 461 U.S. 171, 182 (1983) (striking down total ban on expression on public sidewalks outside of a courthouse). If there were specific, concrete security concerns with a particular event, the proper, narrowly tailored way to deal with them would be to regulate that event, not ban entirely all non student-led events on the same topic, much less all student-led expressive events taking place on that particular day.

It is easy to appreciate why the First Amendment prohibits these kinds of restrictions. Imposing a blanket ban on speech because of its message—and, more precisely, because its message may stir emotions or spark debate—"would completely undercut the 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972) (quoting *New York*

7

*Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). Indeed, "a function of free speech under our system of government is to *invite* dispute," and that function may "best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949) (emphasis added).

That the University's censorship applies to a single, uniquely resonant day only highlights the problem. By silencing speech at its most salient moment, the restriction directly contravenes the public interest in robust, uninhibited debate. Blessing such a restriction would get the First Amendment precisely backwards. It would enable restrictions on everything from speech criticizing or celebrating historical figures on holidays commemorating them, such as Columbus Day or Martin Luther King Day, to protests on the anniversary of the September 11 attacks or the January 6 storming of the Capitol, to discussions about the meaning of the atomic bombing of Hiroshima and Nagasaki on the anniversary of those events. Such speech lies at the heart of the First Amendment's protection. Yet under the University's logic, the government could ban all events on such important anniversaries, severely limiting public debate and expression at the precise moment that it is most called for, most likely to enter the public consciousness, and most likely to have recipients of their messages.

## II. Alternatively, the University's restriction on student-led "expressive events" fails reasonableness review.

Even if the Court were to conclude that strict scrutiny does not apply—either on the ground that the University's restriction is a content-neutral time, place, or manner restriction, or on the ground that the University functions as a nonpublic forum[2]—the University would still

---

[2] Because the Fourth Circuit already held in *Mote* that the University's College Park campus is a limited or designated public forum, the rules governing nonpublic forums would apply only if the Court were to conclude that the forum is not designed to promote student expression at all—such that the external standard applies to student speech. *But see Widmar*, 454 U.S. at 267 n.5 ("[T]he campus of a public university, at least for its students, possesses many of the characteristics of a public forum."); *Mote*, 423 F.3d at 444 (acknowledging that "members of the University

have to demonstrate that its restriction on student-led "expressive events" is reasonable in light of the purposes served by the forum. *See Minn. Voters All. v. Mansky*, 585 U.S. 1, 11–12 (2018). The University cannot satisfy even this more lenient standard.

First, the University's restriction on student-led expressive events is not "reasonable in light of the purpose served by the forum." *Id.* at 13 (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985)). As discussed above, the University functions as a marketplace of ideas for the education of its students. *See Rosenberger*, 515 U.S. at 824; *Healy*, 408 U.S. at 180; *Mote*, 423 F.3d at 444. A total ban on student-led expressive events, even for just a day, would seriously undermine the University's raison d'etre. And even supposing that a university, of all places, could assert a legitimate interest in avoiding controversy related to discussions about Israel and Palestine, a ban on all student-led "expressive events" is not reasonably related to this interest. *See, e.g.*, *NAACP v. City of Philadelphia*, 834 F.3d 435, 445–48 (3d Cir. 2016) (holding that the City of Philadelphia's ban on noncommercial advertising at the airport was unreasonable where it undermined the city's interest in raising revenue through advertising and did not advance the city's interest in avoiding controversy, given the prevalence of controversial content elsewhere throughout the airport).

The second problem with the University's ban is that, under its terms, there is no "sensible basis for distinguishing what may come in from what must stay out." *Mansky*, 585 U.S. at 16. Any restriction a government actor places on a forum must be capable of reasoned application. *Id.* at 23. A ban on all "expressive events" fails that test.

Supreme Court and Fourth Circuit cases addressing bans on "political" speech are instructive on this point. In *Mansky*, the Supreme Court considered whether a blanket ban on "political" apparel in polling places—nonpublic forums—complied with the First Amendment. *Id.*

---

community . . . are permitted to speak freely on University grounds).

9

at 2. Though the ban did not discriminate based on viewpoint, the Supreme Court determined that the restriction failed "even th[e] forgiving test" that applies in a nonpublic forum because the state had failed to "articulate some sensible basis for distinguishing" which kinds of clothing could be banned, and which could not. *Id.* at 16. Notably, the state did not define the term "political," and though the state attempted (during the litigation) to construe the ban only to proscribe "words and symbols that an objectively reasonable observer would perceive as conveying a message about the electoral choices at issue," the Court still held that the ban was incapable of reasoned application. *Id.* at 17–18.

Similarly, in *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179 (4th Cir. 2022), the Fourth Circuit held that a blanket ban on "political" advertisements on public transit—again, a nonpublic forum—was incapable of reasoned application. *Id.* at 199–201. In reaching its conclusion, the court noted that the Richmond Transit Company had not laid out a "formal definition of political," nor provided "written guidelines clarifying how the standard is to be applied." *Id.* at 199.

Here, a blanket ban on "events" deemed "expressive" is likewise incapable of reasoned application. Like the Minnesota government in *Mansky* and the transit company in *White Coat Waste Project*, the University has provided no definition for "expressive," nor of "event," nor guidance on how the October 7th ban is to be applied. Members of the campus community seeking to speak on that day, and administrators tasked with enforcing the ban, are faced with an untenable lack of clarity. Even assuming that the University intends to focus only "expressive events" about Israel and Palestine, rather than *all* expressive events taking place across its campuses, the proposed ban is incapable of reasoned application. Does the ban apply to five students discussing Israel and Palestine in a common area? Or ten students in a public quadrangle? Is an Israeli or Palestinian music concert banned on October 7? Is classroom discussion about Israel and

10

Palestine banned, or does the ban extend only to after class discussion? The University cannot maintain such a sweeping and unclear restriction on campus forums that have traditionally served as marketplaces of ideas for the campus community and beyond.

## CONCLUSION

For these reasons, the Court should GRANT Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction.

Dated: September 25, 2024

Respectfully submitted,

/s/ Nicholas Taichi Steiner

| | |
|---|---|
| Tyler Takemoto* | Nicholas Taichi Steiner (Bar No.19670) |
| Brian Hauss* | David Rocah (Bar No. 27315) |
| Vera Eidelman* | AMERICAN CIVIL LIBERTIES UNION |
| Brett Max Kaufman* | OF MARYLAND FOUNDATION |
| *Of Counsel* | 3600 Clipper Mill Road Suite 350 |
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION | Baltimore, MD 21211 |
| 125 Broad Street, 18th Floor | Tel: (410) 889-8555 |
| New York, NY 10004 | steiner@aclu-md.org |
| Tel: (212) 549-2500 | rocah@aclu-md.org |
| ttakemoto@aclu.org | |
| bhauss@aclu.org | |
| veidelman@aclu.org | |
| bkaufman@aclu.org | *Counsel for* Amici Curiae |
| *not admitted in Maryland* | |

11